[Crim. No. 12010.   In Bank.   July 2, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. GERALD
ALLEN CARTER, Defendant and Appellant.

Matthew M. Kearney, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Elizabeth Miller and Barry H. Lawrence, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant was charged by information with receiving stolen property (Pen. Code, § 496) and with two prior felony convictions. He pleaded not guilty and admitted the prior convictions. A jury found him guilty as charged. He appeals from the judgment of conviction.

On September 28, 1966, at 7:40 p.m. Officer Ronald Martin of the California Highway Patrol went to a street intersection in the San Bernardino area in response to an accident call. At the scene he observed defendant's car in a flood control ditch near the intersection. Defendant was sitting behind the wheel of the car, the engine was racing, and the rear wheels, which were lifted off the ground, appeared to be spinning.

Officer Martin requested defendant to get out of the car and asked him what had happened. Defendant replied that he had had too much to drink. He had a strong odor of alcohol about him, was unsteady on his feet, and had staggered when alighting from the vehicle. He was unable to walk up the slight incline of the ditch by himself and had to be assisted by Martin. Upon the arrival of a second highway patrol officer, Barton Brubaker, standard field sobriety tests were administered to defendant. When he failed these utterly, he was arrested for being drunk in a public place, advised of his constitutional rights to silence and counsel, frisked for weapons, and placed in the rear of the patrol car.

As defendant was seating himself in the patrol car, Officer Brubaker noticed a billfold lying on the doorsill and asked defendant if it was his. Defendant replied that it was. The officer then noticed two papers lying on the ground beneath the doorsill, and upon examining them found that they were Goodyear Rubber Company payroll checks protectorized in the sums of $219.10 and $119.20 respectively but bearing neither the name of a payee nor the signature of a maker. Defendant was asked whether the checks were his. He replied that he had never seen them before. Sheriff's officers were then summoned, and a search of defendant's person by such officers disclosed, among other things, another blank Goodyear Rubber Company check protectorized in the amount of $119.20. The three checks were numbered respectively 1059, 1088, and 1092.

There was evidence at the trial that in March 1966 defendant had been temporarily employed as a carpenter at the Goodyear factory in Cucamonga; that in April of 1966 that establishment had been burglarized and blank payroll checks numbered consecutively from 1034 to 1100 had been taken; and that the cover of the factory's check protector had been removed and a number of keys depressed.

Defendant testified in his own defense that on the afternoon of September 28, after visiting an employment office to see about a job as a carpenter, he began to drink wine and beer in

various bars in the Mt. Vernon area; that he was drinking heavily and did not remember leaving the third bar that he visited; that the next thing he remembered was talking to the arresting officers; that his memory of that conversation was vague; that he had no payroll checks in his possession when he began to drink that afternoon; and that he did not recall anyone handing him such checks or engaging in conversations relative to checks.

After a trial that consumed a day and a half, the jury commenced its deliberations at 11:45 a.m. on January 11, 1967. At 1:45 p.m. the jury returned to the courtroom for the purpose of having certain testimony read, and thereafter retired to continue its deliberations. At 6 p.m. the jury again returned to the courtroom. At this time the judge inquired whether there was a possibility that further deliberation would produce a verdict, and upon receiving an affirmative answer he sent the jury to dinner with instructions to continue deliberation after dinner.

At 8:45 p.m. the jury again returned to the courtroom. The judge who had presided at the trial was not present, but another judge, the Honorable John P. Knauf, was present in his stead. There then took place the proceedings set forth in the footnote.[1]

---

[1] "THE COURT: Ladies and gentlmen of the jury, have you reached a verdict?

"THE FOREMAN: No, we have not, your Honor.

"THE COURT: Without stating which way you stand, will you tell me how you stand numerically?

"THE FOREMAN: Eleven to one.

"THE COURT: Mr. Foreman, is there some question that the Court can help on?

"THE FOREMAN: Yes. I have the two pages marked there that I gave to the bailiff that one of the jurors would like your interpretation on or for you to elaborate on the interpretation of that page. There is a blue X on the page, sir.

"THE COURT: About the only thing I can do is read you the instruction together with the second instruction that goes with it. I can't change the law necessarily.

"THE FOREMAN: Can you elaborate, your Honor?

"THE COURT: We'll see.

[The court then read to the jury CALJIC No. 21 (Revised) and CALJIC No. 22 (Revised), dealing respectively with the presumption of innocence and with the requirement of proof to a moral certainty.]

"Now, I take it that you had both of those instructions with you?

"THE FOREMAN: Yes.

"THE COURT: Does that help any? To read the two instructions together gives you some meaning of the law that you don't get by reading the one.

"THE FOREMAN: I don't know whether it's proper or not, your Honor,

Thereupon, at 8:55 p.m., the jury again retired to continue its deliberations. Ten minutes later at 9:05 p.m., it returned its verdict of guilty.

Defendant's principal contention is that the jury's verdict was the result of coercion by the court.

■ We begin with a general principle, given appropriate expression in *Wissel* v. *United States* (2d Cir. 1927) 22 F.2d 468, 471: "The cases all recognize that the surrender of the independent judgment of a jury may not be had by command or coercion. It is not enough to cure the error to conventionally say that it is the function of the jury to decide questions of fact. Pressure of whatever character, whether acting on the fears or hopes of the jury, if so exerted as to overbear their volition without convincing their judgment, is a species of restraint under which no valid judgment can be made to support a conviction. No force should be used or threatened, and carried to such a degree that the juror's discretion and judgment is overborne, resulting in either undue influence or coercion. A judge may advise, and he may persuade, but he may not command, unduly influence, or coerce."

In *People* v. *Burton* (1961) 55 Cal.2d 328, at page 356 [11

---

but *possibly maybe the juror who is in doubt* here, maybe he could ask you that question. Is that proper?

"THE COURT: Well, *let me ask the juror if he understands the two instructions now?*

"MR. HIPPEL: I understand the instructions. I'm confused as to the precise definition of moral evidence.

"THE COURT: Moral evidence in this use means that produced by human persons, either direct evidence from the witness stand or exhibits or writings or whatever may be produced in the way of some object. The question is then whether or not there is sufficient evidence that would produce conviction in an unprejudiced mind. And that must be read with the other instruction.

"I'd like to ask the jurors again if they feel that there is any chance to reach a verdict in this matter. If you do not think there is, please raise your hand. If you do think there is an opportunity to get a verdict in this matter, please raise your hand if you do think there is an opportunity.

"THE FOREMAN: Two or three hours?

"THE COURT: *No, sir, I'm not going to stay up here two or three hours, that I'll tell you.*

"How long did this case take to try, Mr. District Attorney?

"MR. BURNS [District Attorney]: We began the case yesterday morning at 10:00 o'clock, your Honor.

"THE COURT: Certainly it wasn't a long and complicated case, that's for certain.

"MR. BURNS: That's when we began to select the jury at that time.

"THE COURT: Ladies and gentlemen of the jury, *I'm going to send you out again and I'm going to stay here a half hour. I'd hate to lock you up tonight.* Very well. You are in the bailiff's charge." (Italics added.)

Cal.Rptr. 65, 359 P.2d 433], we observed: "Whether statements of a trial judge amount to coercion of a verdict is peculiarly dependent upon the facts of each case." It is not difficult to apprehend that the reason for this extreme sensitivity to particular factual contexts lies in the fact that the law of California, like the law of other jurisdictions,[2] intimately involves the court in the matter of obtaining a verdict upon the evidence. ▇ Once a cause has been submitted to the jury, and absent a discharge by consent, the court bears the statutory responsibility of assuring that a verdict is rendered "unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (Pen. Code, § 1140.)

The discharge of this responsibility necessarily requires that the court, in cases where the jury has been unable to reach agreement, make the indicated determination of "reasonable probability" and, in cases where in accordance with sound legal discretion (see *People* v. *Greene* (1893) 100 Cal. 140, 142 [34 P. 630]; cf. *Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 6 [22 Cal.Rptr. 649, 372 P.2d 641]) it is determined that such a probability exists, that it take appropriate action to encourage agreement. ▇ Thus, the court in such cases may inquire of the jury as to its numerical division without seeking to discover how many jurors are for conviction and how many are for acquittal.[3] (*People* v. *Lammers* (1951) 108 Cal.App.2d 279, 280 [238 P.2d 667]; *People* v. *Curtis* (1939) 36 Cal.App.2d 306, 325 [98 P.2d 228]; see *People* v. *Tarantino* (1955) 45 Cal.2d 590, 599-600 [290 P.2d 505].) The court also may, and indeed it *should,* question individual jurors as to the probability of agreement. (See *Paulson* v. *Superior Court, supra,* 58 Cal.2d 1, 7; *People* v. *Disperati* (1909) 11 Cal.App. 469, 473 [105 P. 617].) ▇ Then, if the court determines that a reasonable probability of agreement does exist, it may, generally speaking, undertake certain measures calculated to encourage agreement. These include impressing the jury with the solemnity and importance of its task and reminding it that in the event of a mistrial the case will have

---

[2]See generally Annot. 85 A.L.R. 1420; Annot. 100 A.L.R.2d 177.

[3]The division of the jury in terms of votes for conviction and acquittal has no bearing upon the question of reasonable probability of agreement and therefore is of no concern to the court. The effect of the judge's knowledge of the number of jurors for conviction and acquittal will be discussed below as it relates to coercion.

to be retried, with attendant expenditure of money and time, and decided upon similar if not identical evidence by a jury of persons having qualifications equal to those of the present jury. (See *People* v. *Miles* (1904) 143 Cal. 636, 637-640 [77 P. 666]; *People* v. *Swanson* (1932) 120 Cal.App. 173, 178-179 [7 P.2d 380]; *People* v. *Lammers, supra,* 108 Cal.App.2d 279, 282; cf. *People* v. *Burton, supra,* 55 Cal.2d 328, 356-357; *People* v. *Baumgartner* (1958) 166 Cal.App.2d 103, 106-107 [332 P.2d 366].) They also include advising the jury that its members should consider the case dispassionately and should lay aside views held through pride of opinion rather than through conscientious conviction. (See *People* v. *Piscitella* (1928) 90 Cal.App. 528, 533-544 [266 P. 349]; *People* v. *Rhodes* (1912) 17 Cal.App. 789, 792-794 [121 P. 935].)

It is quite clear, however, that such adjurations of the trial court, which would be entirely proper under some circumstances, may under others operate to overbear the independence of the jury and produce a verdict tainted by compromise or concession to expediency. To advert again to our language in *People* v. *Burton, supra,* 55 Cal.2d 328, 356, the question of coercion is of necessity ''peculiarly dependent upon the facts of each case.''

Most cases wherein adjuratory remarks of the court have been held coercive are those in which the court, either through its own questioning or through volunteered statements of jurors, has become informed not only as to the numerical division of the jury but also as to how many stand on each side of the ultimate issue of guilt. (See fn. 3, *ante.*) The urging of agreement in such circumstances of course creates in the jury the impression that the court, which has also heard the testimony in the case, agrees with the majority of jurors. Coercion of the jurors in the minority clearly results. (See, e.g., *People* v. *Baumgartner, supra,* 166 Cal.App.2d 103, 106; *People* v. *Walker* (1949) 93 Cal.App.2d 818, 825 [209 P:2d 834]; *People* v. *Talkington* (1935) 8 Cal.App.2d 75, 83-90 [47 P.2d 368]; *People* v. *Blackwell* (1927) 81 Cal.App. 417, 421 [253 P. 964].)

The rationale peculiar to these cases, and to cases in which the court's remarks more directly show its preference for a particular verdict (see *People* v. *Kindleberger* (1893) 100 Cal. 367 [34 P. 852]; *People* v. *Carder* (1916) 31 Cal.App. 355 [160 P. 686]; *People* v. *Conboy* (1910) 15 Cal.App. 97 [113 P. 703]), is not applicable to the case now before us.      In the instant matter the judge whose remarks are alleged to

have had a coercive effect on the jury, was not the judge who had tried the case. His remarks could not reasonably have left the impression upon the jury that his view of the evidence was in agreement with the majority of jurors.[4] Moreover, the judge in question was not advised as to how many jurors favored a guilty verdict.[5] Thus, if the remarks in question had a coercive effect upon the single dissenting juror, that effect did not derive from his impression that the court, upon its own consideration of the evidence, favored a guilty verdict.

It is clear, however, that coercion of the jury can occur absent any intimation, express or implied, that the court favors a particular verdict. The basic question, as we have indicated above, is whether the remarks of the court, viewed in the totality of applicable circumstances, operate to displace the independent judgment of the jury in favor of considerations of compromise and expediency. Such a displacement may be the result of statements by the court constituting undue pressure upon the jury to reach *a* verdict, whatever its nature, rather than no verdict at all.

The case of *People* v. *Crowley* (1950) 101 Cal.App.2d 71 [224 P.2d 748], is illustrative of the point. There the jury in a burglary case retired for deliberation at 12 noon and returned to the courtroom at 4:22 p.m. declaring its inability to agree. The court, without making inquiry as to how the jury was divided, proceeded to urge them to reach a verdict, stressing the clarity of the evidence and the fact that a retrial meant "an additional burden both on the People of the State and the defendant." (P. 74; italics omitted.) At the conclusion of its remarks, the court stated that if the jury were unable to reach a verdict by 5 p.m. it would be locked up for the night. The jury again retired to the jury room at 4:29 p.m., and returned into court at 5 p.m. with a verdict finding defendant guilty of second-degree burglary.

---

[4]We reject as wholly without foundation in the record defendant's suggestion that Judge Knauf was advised as to the merits of the case during a presumed conference with the judge who had presided at trial.

[5]We are not prepared to accept the suggestion that an 11 to 1 division of the jury indicates that the lone dissenting juror favors acquittal. Similarly, the interest of that juror in the presumption of innocence and the concept of moral certainty, as evidenced by his inquiries following the court's reading of instructions on those subjects, does not indicate his bent on the ultimate issue, for a lone juror holding out for conviction might well evince a similar concern.

The Court of Appeal, reversing the judgment, recognized that the case was easily distinguished from those cases wherein adjuratory remarks are made after the court has learned (and the jury knows that it has learned) that a minority on the jury are holding out for acquittal, but concluded that coercion resulted in the circumstances. "[T]he forbidden result can be accomplished without its having been disclosed how the jurors are divided upon the question of guilt. The jurors know how they are divided and the minority, *especially if few in number,* would be the ones to feel the weight of the pressure." (Italics added.) (101 Cal.App.2d at p. 75.)

After noting that the remarks of the trial court might have been interpreted by the jury as an expression of opinion in favor of conviction, especially in view of the fact that the jury would have been advised to acquit if the evidence had been insufficient to warrant conviction,[6] the Court of Appeal addressed itself to the effect of the threat to lock up the jury. Noting that the jury "reported an agreement just in time to escape this result [being locked up]," the court went on to observe that that threat placed the minority jurors in a position wherein adherence to their conscientious convictions was rendered difficult, if not heroic. "[W]e think it would require unusual stamina in one or more dissenting jurors to hold to their minority views against the remainder, who would naturally be somewhat rebellious at the thought of being locked up for the night at 5 o'clock. . . . After considering the evidence for several hours they [the dissenting jurors] had been unable to agree with their fellow members. Those who believed defendant had not been proven to be a burglar had had an opportunity to hear his testimony and judge of his credibility. We cannot presume that they would have changed their opinions had the questioned proceedings not taken place, and the judgment must therefore be reversed." (101 Cal.App.2d at p.

---

[6]Some cases, notably the case here under discussion and *People* v. *Kindleberger, supra,* 100 Cal. 367, have attached significance in questions of coercion to the trial court's duty to advise acquittal (former Pen. Code, § 1118; cf. Pen. Code, § 1118.1) in the face of insufficient evidence. It does not appear, however, that proper adjuratory remarks coupled with the jury's knowledge of the duty to advise acquittal would have a coercive effect in a case where the evidence is sufficient to support a judgment but is *in conflict.* In *Crowley* the court expressly stated to the jury that the evidence was in conflict: " 'It is true, of course, that there has been *some conflict in the evidence,* but I do not see anything in the evidence of such a nature as to make it impossible for you as jurors to agree one way or the other.' " (Italics in original.) (101 Cal.App.2d at p. 74.)

79; see also *People* v. *Savage* (1954) 128 Cal.App.2d 123, 126 [274 P.2d 905].[7])

The case of *People* v. *Crossland* (1960) 182 Cal.App.2d 117 [5 Cal.Rptr. 781], although it did not involve a threat to lock up the jury, shows in another context how adjuratory remarks not reflecting the court's opinion as to conviction can nevertheless have a coercive effect. There the jury had deliberated for some eight hours, after a two-day trial, and had returned to the courtroom three times for the reading of evidence and for further instructions. The court had the jury returned to the courtroom and was told that there was a 10 to 2 division, with no indication as to how many favored conviction. Thereupon the court made remarks stressing the simplicity of the case and the evidence, and the jury returned to its deliberations. A verdict of guilty was rendered in 23 minutes. The Court of Appeal recognized that the remarks of the trial court could not be considered as advocacy for a guilty verdict, but nevertheless reversed the judgment. "[W]e are unable to distinguish the case at bar from the decisions which hold that insistence upon further deliberation by the jury, coupled with statements that the case is clear or simple, constitutes coercion of the jury and requires reversal [citations]." (182 Cal.App. 2d 117, 119.)

Turning to the case at bench, we have concluded that in the light of the surrounding circumstances the statements of Judge Knauf (see fn. 1, *ante*) were coercive of the jury and require reversal of the judgment. Although it may not be argued, since Judge Knauf did not preside at the trial, that his remarks reflected his view of the evidence or his predilection for a particular verdict, their effect was to exert extreme pressure upon the lone dissenting juror to conform his opinion to that of his fellow jurors. To begin with, it is significant that the dissenter was singled out in open court and questioned as to his understanding of certain instructions reread

---

[7]In *Savage* the court was informed that the jury stood 11 to 1, but was not informed as to how many favored conviction, when it delivered its adjuratory remarks. The Court of Appeal, reversing the conviction, stated that the trial court must have known "or had reason to believe that the 11 jurors stood for conviction, . . .'' We think that this statement reflects a misunderstanding to the effect that jury coercion cannot be found unless it can be inferred that the trial court through its remarks is advocating conviction. (See also *People* v. *Beaugez* (1965) 232 Cal.App.2d 650, 660 [43 Cal.Rptr. 28]; *People* v. *Nails* (1963) 214 Cal.App.2d 689, 696 [29 Cal.Rptr. 671]; *People* v. *Dias* (1962) 208 Cal. App.2d 41, 50 [24 Cal.Rptr. 887].) As we have shown, this view represents too narrow a concept of jury coercions.

by the court. Without interruption the court then forthwith proceeded to an inquiry as to the probability of an agreement, calling for a show of hands by the jury as to whether "there is any chance to reach a verdict." (See fn. 1, *ante*.) While the judge failed to have the record show the results of this inquiry, a fair reading of the transcript indicates that the jury felt there was a chance of agreement and at that point the foreman appears to have offered a suggestion as to the time it would take— "Two or three hours?" Added to the foregoing was the court's observation, apparently based solely upon the fact that the taking of testimony had consumed only one day, that the case was not "complicated." Finally, we are faced with the judge's response to the foreman's suggestion and to the information received from the prosecutor that the case had taken only one day to try. While we realize that a "cold" record may not do justice to the best of intentions, we cannot overlook the exasperated and peremptory tone reflected in the transcript by the judge's statement to the jurors that he was not willing to remain for the indicated length of time and by his stern admonition, couched almost in terms of a threat, that the jurors would be locked up for the night if a verdict were not reached within a half hour. The effective pressure of all these remarks was clearly concentrated upon the lone dissenting juror.

■ We have observed above that the task of the judge, when dealing with a jury experiencing difficulty in reaching agreement, is in any case an extremely delicate one. The sensitivity of that task is augmented when it appears that a small number of jurors opposes the views of the majority, for the tendency of the majority to attempt to impose its will on the minority by means other than rational persuasion can only be made greater, and therefore more pernicious, by intemperate adjurations from the bench. In such circumstances, when the court has determined that a "reasonable probability" of agreement exists in spite of present disagreement, the appeal for agreement which is demanded of him must be couched in terms of conscientious judgment and rational persuasion.

Defendant also contends that the trial court erred when it failed to give *sua sponte* an instruction to the effect that defendant's intoxication could be considered by the jury in determining whether he possessed the mental element requisite to the charged offense. The Attorney General appears to concede that the mental element here in question, to wit,

actual knowledge of the stolen character of the property,[8] is one to which the terms of section 22 of the Penal Code[9] are applicable, and that an instruction based on that section would have been proper if offered by defendant. Since there must be a new trial herein, and the defendant will presumably offer the indicated instruction, we need not here consider whether the failure to give that instruction *sua sponte* was error.

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice McCabe in the opinion prepared by him for the Court of Appeal, Fourth District, Division Two (*People* v. *Carter*, 4 Crim. 2786, filed January 9, 1968, certified for nonpublication).

---

[8]Section 496 subdivision 1 of the Penal Code provides in relevant part that ''Every person who buys or receives any property which has been stolen or which has been obtained in any manner constituting theft or extortion, *knowing the same to be so stolen or obtained* . . .'' is guilty of receiving stolen property. (Italics added.)

[9]Section 22 provides: ''No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.''