Filed 4/21/16  P. v. Carter CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL CARTER,<br><br>     Defendant and Appellant. | B261825<br><br>(Los Angeles County<br>Super. Ct. No. BA415707) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Attorney General, and Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

Acting on information derived in part from a confidential source, police obtained and executed a search warrant for an apartment linked to appellant and defendant Michael Carter (defendant). During the search, police seized three firearms and several vials of phencyclidine (PCP). We consider whether the trial court coerced the jury into reaching a verdict and whether the trial court correctly determined the sealed portion of the affidavit in support of the search warrant did not contain evidence of third party culpability.

## I.  BACKGROUND

On August 15, 2013, police officers detained defendant near 1728½ West 45th Street and executed a search warrant at that address, which was a second-floor apartment. In the bathroom, police found two SKS rifles and a Tech 9 pistol underneath a cabinet drawer with a false bottom. Ammunition was hidden with the guns. The police also found three vials containing a substance later determined to be phencyclidine (PCP) in the refrigerator. In the bedroom, they found various documents with defendant's name on them: a training certificate, a continuing education certificate, an envelope from the Department of Motor Vehicles addressed to defendant at 1728½ West 45th Street, a second similarly addressed envelope, and a menu from "Loco Mike's" restaurant. Defendant's nickname was Loco Mike, and the police later found keys in defendant's possession which opened Loco Mike's restaurant.

Based in part on evidence obtained during the search of defendant's apartment,[1] the District Attorney for Los Angeles County filed an eight-count information against defendant. Counts one and two charged defendant with being a felon in possession of a firearm (a rifle) in violation of Penal Code section 29800, subdivision (a)(1). Count three charged defendant with another violation of Penal Code section 29800, subdivision (a)(1) in connection with his alleged possession of the Tech 9 firearm. Counts four and five charged defendant with possession of an assault weapon (respectively, a Tech 9 and a

---

[1]  Defendant does not challenge the sufficiency of the evidence and we state the facts in the light most favorable to the verdict.

SKS rifle) in violation of Penal Code section 30605, subdivision (a). Counts six through eight charged defendant with possession of a controlled substance (phencyclidine, i.e., PCP) with a firearm, in violation of Health and Safety Code section 11370.1, subdivision (a). The information further alleged that defendant committed all the charged offenses for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b).

At trial on the charged offenses, the prosecution played a video and audiotape of defendant speaking with his ex-girlfriend Yvette Pascascio, who came to visit him while he was detained at the police station. Defendant made numerous references to the firearms police found during the search of his apartment. He said, "They took it all, three . . . . [¶] . . . [¶] They found all them guns." He also said, "[M]aybe like three people knew, about what kind of weapons, but they didn't know where, they didn't know nothing . . . no . . . maybe they can prove the rifles were there . . . ." He added, "I was just about to sell all of that shit. All the guns. I only had three." The prosecution and defense also presented testimony concerning the drug charges and the criminal street gang allegations.

After deliberations that we will describe in greater detail, the jury convicted defendant on counts one and two (felon in possession of a rifle), but found not true the allegation that defendant committed those offenses for the benefit of a criminal street gang. The jury acquitted defendant on counts four and eight (possession of an assault weapon and possession of a controlled substance with firearm). The jury could not reach a verdict on the remaining counts, namely, three, six and seven.[2] Defendant admitted that he had suffered a prior serious or violent felony conviction within the meaning of sections 667, subdivision (b) through (i) and 1170.12 (the Three Strikes law). The trial court sentenced defendant to a total term of seven years, four months in prison, consisting of the upper term of three years for count one, plus a consecutive term of eight months for count two, both doubled pursuant to the Three Strikes law.

---

[2]     Count five was dismissed.

## II.  DISCUSSION

Defendant asks us to review the sealed portion of the affidavit supporting the search warrant, and we have.  We hold the trial court did not err in denying the defense the opportunity to question the affiant about its contents.  Defendant also argues the trial court should not have asked the jury to continue deliberating after the jury foreperson told the court more than once that the jury was unable to reach a verdict.  We hold the trial court did not abuse its discretion or coerce the jury when it told the jury to devote a short period of time to further deliberations after a juror's comment suggested the jury might be able to reach a verdict on some of the charges.

### A.      *Hobbs Warrant*

Detective Mendez, the search warrant affiant, obtained an order sealing a portion of the affidavit in support of the search warrant pursuant to *People v. Hobbs* (1994) 7 Cal.4th 948, which authorizes sealing to protect confidential sources.  Later, two pages of the sealed portion were partially redacted and disclosed to the defense.  Part of the unredacted text on those two pages made reference to a man named Katrell Nelson, and the defense sought to question Detective Mendez about the contents of the sealed portion of the affidavit in an effort to establish a third party culpability defense, i.e., that Nelson was an occupant of the 1728½ West 45th Street apartment such that the defense could argue the guns and PCP seized were Nelson's, not defendant's.

Without objection from respondent, defendant asked us to review the entire sealed portion of the affidavit supporting the search warrant to determine if the trial court abused its discretion in finding that it did not contain third party culpability evidence.  We have undertaken the requested review and hold the trial court did not abuse its discretion in denying the defense request to question Mendez about the sealed portion of the affidavit.

### B.      *Jury Deliberations*

Defendant contends the trial court abused its discretion when it directed the jury to continue deliberations after the jury foreperson indicated three times that the jury could

4

not reach a verdict. He asserts the court effectively coerced a verdict in violation of his constitutional right to a trial by jury.

### 1. *Applicable law*

"The applicable legal principles are well established. Under section 1140, the trial court is precluded from discharging the jury without reaching a verdict unless both parties consent or 'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' [Our Supreme Court has] explained that '[t]he determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court.' [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' [Citations.] (*People v. Rodriguez* [(1986)] 42 Cal.3d 730, 775; see *People v. Rojas* (1975) 15 Cal.3d 540, 546; *People v. Carter* (1968) 68 Cal.2d 810, 817.)" (*People v. Sheldon* (1989) 48 Cal.3d 935, 959.)

When faced with a jury that claims it is deadlocked, "'a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least consider how it can best aid the jury.' [Citation.]" (*People v. Young* (2007) 156 Cal.App.4th 1165, 1171-1172, italics omitted.) As long as the trial court avoids coercing the jury to reach a verdict, there is no bar against inquiring into the possibility of agreement, nor is it improper to suggest further deliberations. (*People v. Bell* (2007) 40 Cal.4th 582, 616.) The court must reasonably conclude, however, that any directions for further deliberations "would be perceived ""'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.'"" (*Ibid.*)

### 2. *Background*

Excluding jury selection, trial of this case was completed over the course of five days in December 2014 and January 2015. After roughly three hours of deliberations, the

5

jury sent three questions to the court.[3]  The court conferred with counsel and sent responses to the jury.  The jury then deliberated for approximately an hour and a half until taking a break for lunch.

After the lunch break, the court stated that it had received a communication from the jury "which indicates that the jury may be undecided on all counts, inquiring if I have any ideas.  [¶]  There's a further representation that the foreperson articulated that this posture on behalf of this jury is not expected to change any time soon."

The trial court called the jury back to the courtroom and gave a further instruction on deliberations using CALCRIM No. 3551, which states in pertinent part:  "[S]ometimes juries that have had difficulty in reaching a verdict are able to resume deliberations and successfully reach a verdict.  [¶]  Please consider the following suggestions:  [¶]  Do not hesitate to reexamine your own views. . . .  [¶]  Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the Defendant are entitled to the individual judgment of each juror. [¶]  It is up to you to decide how to conduct your deliberations."

The court added:  "The court is mindful that this jury resumed deliberations after a weekend.  If you believe there might be any benefit of simply adjourning today, coming back tomorrow, or when all of you can be present, to give this one last final effort, then I would suggest doing that.  [¶] . . . [¶]  On the other hand, if this jury believes that they have exhausted every possible avenue with respect to reaching a unanimous verdict on one or more counts, then I am inclined to respect that."

---

[3]     The first question asked the court to "please define again reasonable doubt where it would apply in a verdict of guilty, then if that burden is not met, then a not guilty verdict must be chosen."  The court answered the question by telling the jury to refer to the CALCRIM No. 220 instruction regarding reasonable doubt.  The second question inquired about why the police targeted the 1728½ West 45th Street address where the guns and PCP were recovered.  The third question concerned the out-of-court statements made by defendant and his ex-girlfriend Yvette Pascascio on the recording played for the jury.

6

The court then questioned the foreperson about the state of deliberations. The foreperson explained that "several" ballots had been taken on each count and there was more than one count where the numerical split was "11-to-1." The trial court indicated that it "would be inclined to ask this jury to return one last day" and asked if the jury had discussed when they would be able to reconvene. The court emphasized, "I'm not asking that you devote the entirety of a day if, in fact, a portion of a day can be devoted to this . . . ."

The court also addressed "the single juror who represents the one vote, please, I reiterate what I just read from the instructions. [¶] You are encouraged to reexamine your position, but you must ultimately be true to your decision. If, after further discussion with the other jurors, after personal reflection you still believe you are right and the other 11 are in error, do not change your position. I can't be any clearer than that." The jurors then left the courtroom to determine when they could reconvene.

After the jurors left the courtroom, defense counsel objected to sending the jury back for another day because "I think the one juror might feel that he or she will change their vote just to get out of here." The court responded, "Okay. And I tried, in the words that I chose, to emphatically say that I want that person to resist that inclination if it would exist." Defense counsel acknowledged that the court had chosen its words carefully, but argued that "people react differently under peer pressure . . . ."

The court replied: "I will simply augment the record to say that I have watched this jury over the now three weeks that we've been in trial. I think they have really taken to heart the admonition to treat one another courteously. [¶] We have certain people on this jury that I think make that very evident that that is, in fact, the manner of interaction, but I'm also mindful that they've only been deliberating for one full day. They had a portion of a day on Friday. So to ask them to come back one additional day, I don't think is unreasonable. [¶] But I'm also quite adamant that if they, at the end of, perhaps a morning or afternoon session, indicate that there is no change in their position, I'm prepared to declare a mistrial at that point."

7

The jurors later returned to the courtroom, and the court asked the foreperson, "What is being proposed?" The foreperson replied: "If I may, your Honor. We did go back and pose the possibility of coming back tomorrow. We also took another vote on a couple of counts that I talked to you about previously, and it was clear that that vote would not change based on returning. I just want to be clear about that. [¶] I did say if your Honor was adamant, what would we all decide, and that would be tomorrow morning at 9. However, I just wanted to let you know that that was what we decided while we were back there."

Outside the jury's hearing, the court told counsel its inclination was to declare a mistrial. Defense counsel did not object but the prosecutor did, arguing there was no harm in having the jurors return in the morning. The court then addressed the jury, first asking only the foreperson whether the foreperson believed the court could do anything to assist the jury in reaching a unanimous verdict. The foreperson stated, "I can't think of anything offhand, your Honor." The court then asked jury as a whole: "Are there any other jurors who believe that they might perceive something that would assist the jury in reaching a unanimous verdict? [¶] Again, I'm not pressuring anybody, but you know the dynamics of your discussions. I do not." Apparently noticing Juror No. 7 on the verge of answering, the court asked, "Juror No. 7, are you trying to select words?"

In response, Juror No. 7 asked the court about the reasonable doubt standard. Although the court had simply referred the jurors to the CALCRIM instruction on reasonable doubt when the jury had asked about reasonable doubt earlier that morning, the court, without objection, slightly paraphrased the reasonable doubt standard when answering Juror No. 7's question. Juror No. 7 also asked the court about "what is excluded from evidence . . . ." The court explained that unless the court had directed otherwise during trial, anything received from the witness stand was evidence, adding that "if you heard it, and I did not strike it, that is evidence that you are asked to consider." After the court answered Juror No. 7's questions, the court asked if the information "help[ed]." Juror No. 7 agreed it had.

8

Following this exchange, the court told the jury: "If you would like to continue to deliberate for another half hour, 15 minutes, that's fine, okay? Is that acceptable that we continue to deliberate a little bit more today, and then you let me know where you stand at the conclusion of those deliberations? [¶] I see a lot of nodding heads. Please continue your deliberations."

The jurors deliberated for another 25 minutes and then returned. They reached verdicts on four counts (two guilty and two not guilty), but remained unable to reach unanimous verdicts on the other three charged counts. The trial court declared a mistrial on the three unresolved counts and excused the jury.

### 3. *Analysis*

Defendant contends that at the point when the court indicated it was inclined to declare a mistrial, there was no reasonable probability that the jury would agree, and so the trial court abused its discretion in directing the jury to continue deliberating.

The question of coercion is necessarily dependent on the facts and circumstances of each case. (*People v. Breaux* (1991) 1 Cal.4th 281, 319.) Here, the first day of deliberations occurred on January 2. Jurors deliberated that Friday afternoon and broke for the weekend with no indication of a deadlock. On Monday morning, jurors sent three questions to the court shortly after they resumed deliberations. They deliberated about 90 minutes after receiving the court's answers, then took a break for lunch. When jurors returned, they announced they were deadlocked. When compared to the duration of the trial, especially given the fairly short time between receiving the answers to their questions and announcing the deadlock, the extent of the jurors' deliberations was not so disproportionate as to indicate it was coercive to ask them to deliberate for a short time and to then let the court know where they stood.

Rather, in our view, the trial court could (and did) appropriately conduct a final inquiry of the jury as a whole before declaring a mistrial. This inquiry produced a response from Juror No. 7, and light of this development, the trial court did not abuse its discretion in impliedly finding that there was a reasonable probability that the jury could

9

reach agreement on some counts. The court's repeated and firm directions that no juror should change his or her mind simply because the court asked the jury to further discuss matters reinforces our conclusion that the court did not coerce a verdict in violation of defendant's jury trial right. (See *People v. Harris* (2005) 37 Cal.4th 310, 364-365 [no coercion even where jury not expressly reminded they should not surrender their individual beliefs because court's polling of the jurors reminded them of their individual responsibilities in the deliberative process].)

Defendant contends, however, that Juror No. 7's questions were substantially similar to the questions asked by the jury earlier that morning such that the trial court's decision to direct further deliberations amounted to "mere pressure to reach a verdict on the basis of matters already discussed and considered." (*People v. Bell*, *supra*, 40 Cal.4th at p. 616.) True, Juror No. 7's question about reasonable doubt was similar to the jury's prior question, but the court gave a slightly different answer that the jurors may have found easier to understand or apply. Juror No. 7's question about excluded evidence, on the other hand, was not the same as the prior questions earlier that morning, which involved consideration of the videotape and why defendant's apartment was targeted for a search. Thus, the court was not merely asking the jury to reach a verdict on matters already discussed and considered.

Indeed, Juror No. 7 agreed the court's answers had "helped," and when the court inquired as to whether the jury would find it acceptable to deliberate for a brief additional time, the court saw "a lot of nodding heads." Under the circumstances, the court did not abuse its discretion in asking the jury to do just that, and defendant has not established the verdicts on counts one and two were the product of jury coercion.

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:



TURNER, P.J.



KRIEGLER, J.

11