Filed 2/5/21  P. v. Askia CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>YUSUF ABDULLATEEF ASKIA,<br><br>　　　Defendant and Appellant. | B301523<br><br>(Los Angeles County<br>Super. Ct. No. MA075457) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Modified and affirmed with directions.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Yusuf Abdullateef Askia was convicted of assault with force likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(4).)[1] On review, we conclude (1) Askia's *Miranda*[2] rights were not violated when an officer asked "what happened?" at the crime scene; (2) the court properly refused an instruction on defense of property; and (3) no coercion occurred when the court told the deadlocked jury to continue deliberations. The Attorney General concedes, and we agree, that a one-year sentence enhancement must be stricken. (§ 667.5, subd. (b).) With a modified prison sentence, we affirm.

## FACTS AND PROCEDURAL HISTORY

Jose Espinoza was working at Palmdale Recycling on January 7, 2019. He saw Askia park a shopping cart in the facility's drive-through lane, where people in cars drop off items. Espinoza knew Askia came by regularly, to sell recyclables. They had never clashed in prior encounters.

Askia sought to sell copper wire. Espinoza explained to Askia that the item was not in marketable condition because it was a mix of bare wire and wire coated with melted plastic sheathing. Espinoza consulted an experienced coworker and a manager; they confirmed that the wire was unsuitable for purchase. Espinoza told Askia he could try to sell his wire at a nearby recycling center.

Askia dismissed Espinoza's explanations. He asked if Espinoza is racist, raised his voice, and advanced on Espinoza with his arms in a fighting posture. Espinoza denied racism and explained again why he could not buy the wire. Askia asked if Espinoza wanted to step outside and fight. When Askia became threatening, Espinoza asked his manager to call 9-1-1, saying " 'we have to get the sheriffs out here as fast as possible before something happens.' "

---

[1] Undesignated statutory references are to the Penal Code.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Testimony from the suppression hearing is recited in part 1 of the Discussion, *ante*.

Surveillance cameras at Palmdale Recycling captured the initial interaction between Askia and Espinoza but not the assault. Espinoza is seen examining the wire in Askia's shopping cart, then Espinoza's colleague also inspects the wire. A client drives into the facility and Espinoza's manager appears.

Espinoza asked Askia several times to move his cart from the drive-through lane so he could help the next customer. Askia ignored the request. As Espinoza pulled the cart aside, he saw Askia charge at him with clenched fists. Espinoza let go of the cart, which he had moved a few feet, and took a step back. Askia struck Espinoza hard in the face.

Espinoza kept a folding knife in his pocket to cut bags for recycled material. When Askia charged at him, Espinoza pulled the knife from his pocket just before Askia hit him. As he fell backward after being hit, Espinoza reached out and stabbed Askia in the chest; he feared Askia was going to keep punching or would kick him when he was on the ground. Askia did not react to being stabbed.

After Espinoza fell, his manager ran up and pushed Askia back to prevent a further attack. Askia looked angry and was "screaming a whole bunch of stuff," including that Espinoza's blood was on his shirt. Espinoza replied that it was not his blood because he did not touch Askia's shirt. Askia looked closer and realized that he had been stabbed.

Shermaine Wherry was waiting for service inside Palmdale Recycling. She saw and heard a worker ask a man to move his shopping cart. She identified Askia as the person with the cart. He was about 15 feet from her vehicle.

Wherry heard Askia yell that he would not move his cart. The worker said he was going to move the cart so he could serve other clients. As soon as the worker began to move the cart, Wherry saw Askia "hit him from behind [and] start beating him up," striking the worker multiple times with his fist. She saw the worker fall backward to the ground, bloodied and unconscious. Wherry did not see the worker fight back or stab Askia.

3

After Askia's attack, Espinoza was dazed, dizzy, and in pain. He did not recall if he hit his head when he fell. His eye was swollen shut, hemorrhaged internally, and did not heal for two months. He bled from his nose and gums and suffered a back injury that required three months of therapy.

Deputy Joshua Friedman arrived at Palmdale Recycling after the altercation. He found Askia wandering the street in front of the facility. As he detained Askia and handcuffed him on the curb, facedown, Friedman asked, "What happened?" Askia replied that "he started a fight and got stabbed." Friedman rolled Askia over and saw blood and a stab wound. Askia was taken to the hospital.

Friedman encountered Espinoza, who was sweating, out of breath, hunched over and stumbling; his eye was swollen shut, he did not know what day it was and could not remember anything at first, except that he was in a fight. Eventually, Espinoza recalled that he was punched in the face multiple times, hit his head on the ground, and blacked out. Friedman believed that Espinoza had a severe head injury. Espinoza said he used a knife, which Friedman found on the driveway.

Askia testified that he made a living redeeming recyclables. On January 7, 2019, he took items to Palmdale Recycling and showed Espinoza copper wire in his shopping cart. Askia had seen Espinoza 10 to 15 times before, and they never had a negative interaction. Espinoza always accepted Askia's items. On this occasion, Espinoza refused to accept the material in the cart. Askia approached another employee, who explained that Askia had to strip the wire. Askia went back to Espinoza, who refused Askia's recycling because it was "dirty."

Askia felt Espinoza was rude and asked if he was racist. He sat down to show he was not being aggressive and offered Espinoza some recyclable bottles and cans. Espinoza said, " 'Get out [of the] way. Customers are behind you.' " Askia told Espinoza to call police, terming the situation "very unusual."

The manager recommended a facility that takes copper wire when Askia complained that his recyclables were rejected. A customer

started yelling at Askia from her car. Espinoza was "very quiet" yet looked "aggressive," "like he was thinking something bad," Askia testified.

Espinoza pushed Askia's cart to "move[ ] it out [of] the way." Askia felt disrespected and thought Espinoza might "throw my stuff away." Asked why he hit Espinoza, Askia replied, "I wanted somebody to call the police," and felt he was "being set up." He figured that hitting Espinoza would bring police.

The manager accused Askia of assaulting Espinoza. While Askia was conversing with the manager, Espinoza rushed over and stabbed Askia twice in the chest. Askia began to flee but felt "woozy" so he lay down near the front of the recycling facility. Officers arrived and immediately asked him, " 'What happened?' " He answered, "I showed up here, and they tried to kill me." He was hospitalized for two weeks.

Askia acknowledged having two 2007 felony convictions for robbery and 2015 convictions for battery on a peace officer and bringing controlled substances into a jail.

Askia was charged with and convicted of assault by means of force likely to produce great bodily injury. (§ 245, subd. (a)(4).) He admitted his prior serious or violent felony convictions, which the court found true. He was sentenced to nine years in prison, consisting of the upper term of four years for the assault doubled (§§ 667, subd. (d), 1170.12, subd. (b)), plus one year for a prior prison term (§ 667.5, subd. (b)).

## DISCUSSION

### 1. Admissibility of Askia's Statement to Deputies

The court allowed the People to present Askia's statement to deputies that he "started a fight and was stabbed." He argues that the evidence had to be excluded because he was not given *Miranda* warnings. The court's conclusion that *Miranda* warnings were not required is reviewed de novo; its underlying findings regarding " 'custody' and 'interrogation' " are scrutinized for substantial evidence. (*People v. Clair* (1992) 2 Cal.4th 629, 678 (*Clair*).)

5

At a hearing, Deputy Friedman testified that he and his partner went to Palmdale Recycling to investigate a report of "two men arguing." En route, they were advised that an assault occurred. A male Black pushing a shopping cart started a fight and "the guy was bleeding," without specifying which "guy" was hurt. Deputies were not told of a stabbing.

On arrival, Friedman saw a Black man "stumbling" and "walking deliriously" on the highway. Deputies removed him from the roadway and saw he matched the description of a person involved in the altercation. Askia was detained and handcuffed on the curb. He was not arrested because deputies had "to figure out who was the suspect and who was the victim," according to Friedman, who did not give *Miranda* warnings.

Friedman testified that as he rolled Askia over after handcuffing him, "I asked what happened. He told me he started a fight and he got stabbed." Deputies saw Askia's wound and applied pressure to it. Friedman detained the other participant because "we weren't sure who started the fight. I know [Askia] said he started it, but we weren't sure because he had a stab wound." Friedman "assumed that [Askia] was the victim, and I know that it was stated in the call that he might be the suspect, but I didn't think, you know, a suspect would have a stab wound." Friedman was not seeking an incriminating statement. He "wanted to know if [Askia] was the victim or if he was actually the aggressor in the fight."

The court deemed Friedman "credible" and found he did not intend to elicit an incriminating response from Askia by making an investigative inquiry. The court found no interrogation. By asking "what happened"—not "what did you do"—Friedman was "trying to assess the situation:" The 9-1-1 call said someone was bleeding and he had to assure everyone was safe and received medical treatment.

Askia contends that his statement about starting a fight occurred during a custodial interrogation. We disagree. An " 'interrogation' " is questioning that is "reasonably likely to elicit an incriminating response." (*People v. Farnam* (2002) 28 Cal.4th 107, 180.) An

6

interrogation does not include a basic investigative inquiry during a temporary detention near the scene of a recent crime. (*Ibid.*; *Clair, supra,* 2 Cal.4th at pp. 679–680.)

"Likewise, the term 'custody' generally does not include 'a temporary detention for investigation' where an officer detains a person to ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." (*People v. Farnam, supra,* 28 Cal.4th at p. 180; *Clair, supra,* 2 Cal.4th at p. 679 [no " 'custody' " if an officer, with gun drawn, asks a defendant at the crime scene who he is, for identification, if he lived there, and what he was doing].)

Deputy Friedman asked one question: "What happened?" Askia replied that he started a fight and was stabbed, prompting deputies to render medical assistance and call for an ambulance. Friedman believed Askia could be the victim, not the suspect, because he was stabbed. Though Askia denigrates Friedman's veracity, the court found him credible.

The deputy's "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" was not custodial interrogation. (*Miranda, supra,* 384 U.S. at p. 477.) Though Askia fit the description of a suspect, his stab wound suggested there was an armed, dangerous person loose in the area. (*New York v. Quarles* (1984) 467 U.S. 649, 657, 659 [no need for *Miranda* warnings before questioning if the situation suggests a likely threat to police or the public].)

" 'When circumstances demand immediate investigation by the police, the most useful, most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation . . . and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.' " (*People v. Davidson* (2013) 221 Cal.App.4th 966, 968.)

The officer's question was " 'brief and casual' "; it was not "aggressive, confrontational, accusatory, coercive, or sustained."

7

(*People v. Davidson, supra,* 221 Cal.App.4th at p. 973.)  Friedman did not intimate that Askia had engaged in wrongdoing.  Further, "Handcuffing a suspect during an investigative detention does not automatically make it custodial interrogation for purposes of *Miranda*." (*Davidson*, at p. 972.)  Deputies saw Askia "walking deliriously" in lanes on the highway.  They could legitimately handcuff him "for officer safety purposes." (*Ibid*.)  This was an investigative detention, not custodial interrogation.  *Miranda* warnings were not required.

Even if the court erred by admitting Askia's statement, the error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 22–25.)  Askia was not prejudiced by his statement to deputies that he started a fight because it was undisputed at trial that he instigated violence.

Espinoza said he was moving Askia's shopping cart when Askia charged at him and struck his head.  Eyewitness Wherry heard Espinoza say he was going to move the cart aside, then saw Askia "start beating [Espinoza] up."  She did not see Espinoza strike Askia. Askia testified that he punched Espinoza first; he did not claim that Espinoza—who was "very quiet"—hit him.  There is no question that Askia instigated violence.  No prejudice arose from admitting his consistent statement to deputies.

## 2.  Defense of Property Instruction

Askia requested that the jury be instructed on defense of property.[3]  He argued that he defended his property when "he thought

---

[3] CALCRIM No. 3476 reads:  "The owner [or possessor] of (real/[or] personal) property may use reasonable force to protect that property from imminent harm. . . .

"***Reasonable force*** means the amount of force that a reasonable person in the same situation would believe is necessary to protect the property from imminent harm.

"When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the

8

his cart was being taken away from him." The court ruled that no substantial evidence supports the defense because Askia "never said that his shopping cart had anything to do with the reason that he struck" Espinoza. It refused the instruction.

The court may refuse an instruction requested by the defendant if it is not supported by evidence sufficient for a jury to find in his favor. (*People v. Moon* (2005) 37 Cal.4th 1, 30.) The court did not err in refusing Askia's proposed instruction.

Defense counsel asked, "Why did you hit Jose?" Askia answered, "I wanted somebody to call the police, and I didn't want to leave from the view of the camera if something happened to me like get stabbed and killed or something. I didn't know who this person in this car was. I didn't know if I was being set up. I wanted somebody to call the police and help. Somebody sees the incident like that, more than likely they're going to call the police. Help is going to come."

Askia's justification had nothing to do with protecting his property. This was consistent with opening argument, when defense counsel said Espinoza's rejection of the wire caused Askia to be "upset, but he did nothing more than be upset. At some point [Espinoza] approached him. My client believed that he was going to be hit. So he, in self-defense, punched the guy back [*sic*] in the face." Because neither counsel nor Askia said he was defending *property* (as opposed to himself), the prosecution did not question Askia about the force he used to protect the cart.

Askia testified that Espinoza pushed the cart out of the way, causing him to feel Espinoza was "being disrespectful" and might "throw my stuff away." This was not part of his answer to "Why did

---

defendant's beliefs were reasonable, the danger does not need to have actually existed.

"The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable to protect property from imminent harm. If the People have not met this burden, you must find the defendant not guilty of [assault]."

9

you hit Jose?" Askia threatened Espinoza *before* he moved the cart, not because he moved it. Askia called Espinoza a racist, raised his voice, took a fighting stance, and asked if Espinoza wanted to go outside and fight. Wherry heard Askia yell at Espinoza. Askia did not testify that he wanted police called to help protect his property.

There is no reasonable probability that omitting the instruction affected the outcome. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Defense counsel asserted at closing argument that Askia felt "his possessions were being taken from him, being stolen from him" so "he approached Mr. Espinoza to try and get his property back from him . . . and there's nothing wrong with that." Given the brutal attack witnessed by Wherry and the severe injury to Espinoza, it is not reasonably probable a jury could find Askia used "reasonable force." He made no effort to retrieve his cart in a nonviolent manner, even after he was asked to move it aside. No reasonable juror would believe his property was in danger of "imminent harm." Askia testified that Espinoza "moved [the cart] out the way" to unblock the driveway, not to steal his unsalable copper wire.

## 3.  The Court Did Not Coerce a Verdict

The jury took eight votes without reaching a verdict. It sent a note reading, "we agree on an assult [*sic*] charge but no agreement on severity. Please advise." The court noted that jurors had not deliberated for long, adding, "What I would like to do before we declare a mistrial, if we need to do that, is read you an additional jury instruction to tell you all how I think you should approach your deliberations and give you some suggestions about things that might be helpful, one of which will include additional argument." The court gave supplemental instructions and the attorneys made further argument on the charged offense and lesser included offense. The jury then reached a verdict.

Askia asserts that the court's comment "before we declare a mistrial" coerced a verdict. The claim was forfeited by counsel's failure to object. Even if the claim were preserved, it would not succeed. Coercion occurs if the court " 'expresse[s] an opinion that a verdict

10

should be reached.' " (*People v. Peoples* (2016) 62 Cal.4th 718, 783.)  It is not coercive to direct further deliberations following more instruction and argument by counsel " ' " ' "to enhance [jurors'] understanding of the case rather than [apply] mere pressure to reach a verdict on the basis of matters already discussed and considered." ' " ' " (*Ibid.*)

The court did not tell jurors that a verdict must be reached.  Instead, it said, "each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all the evidence with your fellow jurors.  It is your duty as jurors to deliberate with the goal of arriving at a verdict on a charge if you can do so without violence to your individual judgment.  Both the People and the defendant are entitled to the individual judgment of each juror."  This language was proper.  (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1121.)

A passing comment about mistrial does not amount to coercion.  In *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, the court told a deadlocked jury to continue deliberations, adding, " 'the court is not going to at this point declare a mistrial . . . based on what we have talked about right here.' "  (*Id.* at p. 459.)  Our Supreme Court rejected the defendants' claim of jury coercion, concluding that the court did not displace the jury's independent judgment or pressure it to reach a verdict.  (*Id.* at pp. 460–463.)

Here, the court asked for continued deliberation, without displacing or pressuring the jury.  It "made no reference to the subject of costs, the prospect of a retrial, or the desirability of a verdict." (*People v. Butler* (2009) 46 Cal.4th 847, 884.)  Nor did the court coercively suggest that the jury might be "locked up for the night" for failing to reach a verdict in a simple case. (See *People v. Carter* (1968) 68 Cal.2d 810, 817–819, and cases cited therein.)

The jury had already decided that an assault was committed.  The severity of the crime was the sticking point.  It heard additional argument about assault with force likely to produce great bodily injury (§ 245) and the lesser offense of simple assault (§ 240).  There is no

11

basis to conclude that a passing mention of "mistrial," without more, coerced a verdict.

## 4.  Cumulative Error

Askia claims cumulative error.  We have not found error or prejudice to Askia that warrants reversal; therefore, there is no error to "accumulate."  (*People v. Johnson* (2015) 60 Cal.4th 966, 996; *People v. Williams* (2015) 61 Cal.4th1244, 1291.)

## 5.  One-year Enhancement

Askia contends that the court erroneously applied a one-year enhancement.  (§ 667.5, subd. (b).)  Effective January 1, 2020, this enhancement applies to prior prison terms for "a sexually violent offense."  It affects pending appeals.  (*People v. Winn* (2020) 44 Cal.App.5th 859, 872–873.)  Askia's prior prison enhancement was based on conviction of possessing a controlled substance in prison, which is not a sexually violent offense.

Respondent concedes that the one-year enhancement must be stricken.  We accept the concession.  We need not remand the case for resentencing because the court imposed the upper term of four years, doubled for the prior strike conviction, which is the maximum sentence. (*People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15; *People v. Winn, supra,* 44 Cal.App.5th at pp. 872–873; *People v. Lopez* (2019) 42 Cal.App.5th 337, 342.)

**DISPOSITION**

The sentence is modified to strike the one-year enhancement imposed under Penal Code section 667.5, subdivision (b).) The aggregate sentence is now eight years in state prison. Upon issuance of the remittitur, the trial court shall send an amended abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is affirmed as modified.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.

13