Filed 10/31/25  P. v. Turner CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>DEREAK TURNER,<br><br>    Defendant and Appellant. | A171252<br><br>(Alameda County<br>Super. Ct. No. H58999) |

Defendant Dereak Turner appeals a judgment entered after a jury found him guilty of second degree murder.  He contends the trial court abused its discretion in excluding evidence of a prior altercation in which the victim was involved; that it committed instructional error; that the prosecutor committed misconduct; that the court improperly instructed the jury to continue deliberating after it reached an impasse; and that the court erred in failing to strike a firearm enhancement.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of defendant's second trial for the 2009 murder of Thomas Cunningham.  On appeal after the first trial, we reversed defendant's conviction for second degree murder because he was prejudiced

by admission of evidence of an unrelated killing.[1]  (*People v. Turner* (Dec. 23, 2021, A159822) [nonpub. opn.].)

The second trial took place in 2023.  There was no dispute that defendant killed Cunningham:  he admitted doing so, but contended he acted in self-defense, either perfect or imperfect.

***Prosecution Evidence***

About 10:00 on the evening of November 24, 2009, Cunningham walked from his home to a nearby store to get ice cream with his daughter, Chelsie, who was about 13 years old.  They had their two dogs with them, a German shepherd and a smaller dog, who were not leashed.  Cunningham had been drinking that day, but he did not appear to Chelsie to be intoxicated. Cunningham went into the store while Chelsie stayed outside with the dogs, then he came back outside.

As Cunningham and Chelsie began to walk home, Chelsie saw a man— who there is no dispute was defendant—approaching.  The larger dog walked up to defendant in an excited manner and sniffed his leg.  Defendant asked them in a nervous voice to get the dog.  Chelsie grabbed the dog by the collar and pulled him away from defendant.

Cunningham, who was ahead of them, heard defendant talking to Chelsie, and he turned around and asked, " 'What?' " in a confrontational manner.  Chelsie took the dogs over to some bushes, heard Cunningham and

---

[1] In the first trial, defendant was accused of both the murder of Cunningham in Hayward and an unrelated murder in Oakland.  After evidence of both homicides had been presented, the trial court severed the two cases, and the jury was asked to consider only the killing of Cunningham. In defendant's prior appeal, we concluded the trial court's instruction that the jury disregard the evidence of the Oakland killing was insufficient to cure the prejudice from its admission, so we reversed the judgment and remanded the matter for a retrial.

defendant raising their voices at each other, and saw them getting "a little bit closer to each other." She said to Cunningham, " 'Come on, dad. Let's drop it. Let's go.' " Defendant pulled out a gun and shot Cunningham, who was between seven and 10 feet away. Chelsie did not recall seeing Cunningham lunging toward defendant in any way.

The jury heard the prior sworn testimony of Yvonne Gonzales. On the evening of the killing, she was walking to the store, hoping to buy drugs from defendant. She called him, and while they were on the phone, she heard dogs yapping and defendant saying, "Get them off of me" and threatening to "put a cap in your ass," then the sound of a little girl, then the "pow-pow" sound of two gunshots. Defendant sounded agitated, as if the dogs were jumping on him. The yapping sounded as if it came from a smaller dog, and she heard no growling. Defendant ran past Gonzales, and she told him to go to her house.

A detective for the Hayward Police Department testified about a conversation he had with a man named Andrew West. According to West, defendant told West that after the shooting, the gun was thrown on top of an apartment building somewhere and later retrieved and thrown into a body of water. Defendant also told West that as he was about to walk away from the confrontation with Cunningham, he felt the presence of someone running behind him, "like charging [him]," and defendant turned and shot.

Cunningham suffered two gunshot wounds, which caused his death. One of the gunshots was to the front of his left shoulder, and its path was traced downward to the back side of the abdomen. The other wound was to the left side of the chest, and its path was likewise in a downward direction.

### Defense Evidence

In his own defense, defendant testified as follows:

3

Defendant was 20 years old at the time of the shooting. He was employed, but he also occasionally sold drugs.

Defendant testified that on the evening of the killing, he was walking with his head down, and the German shepherd dog approached him and tugged on his pants. He said aloud, " 'Can somebody come get your dog?' " in a concerned or apprehensive manner. Chelsie approached and pulled the dog away to a corner by the side of the store. Cunningham approached in a "belligerent and aggressive" manner and asked " 'What did you say?' " followed by a racial epithet. Defendant was taken aback at the racism that Cunningham expressed. They began arguing from a distance of about four to six feet apart.

Defendant turned and began to walk away, and he heard Chelsie say, " 'No, let's just go,' " which "made [his] heart start racing." He turned around, saw Cunningham trying to "rush [him], like, like he was going to tackle [him]," and he panicked. He feared for his safety, thinking the dog would defend Cunningham if the two of them "tussl[ed]." And, he explained in his testimony, he weighed about 180 or 185 pounds, while Cunningham was stocky, "built like a bull, real barrel chested." Defendant was carrying a firearm, and he stepped back, pulled out his gun, and shot Cunningham twice in rapid succession. Defendant noticed the German shepherd coming in his direction, and he turned and ran away.

He called someone he knew, Nicole H., and asked her to pick him up where he was hiding in a carport. Nicole drove him to her apartment, and he leaned his car seat back. At Nicole's apartment, he called someone else to pick him up.

On cross-examination, defendant denied recollection or knowledge when the prosecutor asked him a number of questions: He could not recall

when he bought the gun he used to kill Cunningham. He wanted a gun for self-defense, because he had been robbed at gunpoint when he was 13 years old. He thought he bought it at the home of a friend; he had a choice of several to buy, and he chose a small caliber gun that did not make much noise. He could not explain why it would matter that a gun was relatively quiet if he intended to use it only for self-defense, except to say he thought he would not get a fair trial because he was African American. Pressed on why the sound mattered, defendant provided no more detail, and the prosecutor asked, "Is it fair to say you're not going to answer that question?" to which defendant replied, "If that's how you want to take it." Defendant did not recall whether he test-fired the gun to make sure it was working. He did not recall whether he bought new bullets after purchasing the gun. He did not recall what he did with the gun after killing Cunningham, saying he "might have sold it" or "[g]ot rid of it," although he could not say how much later. He did not recall whether he ever discussed the killing with West, who was a friend of his. He did not recall whether he was on the phone with Gonzales at the time of the killing.

Defendant was asked about a telephone call he had with his mother after he was arrested in April 2010. During the call, defendant asked her to tell his uncle to get rid of a jacket and that he had spilled some bleach on it. Defendant said he was not referring to the clothing he was wearing when he killed Cunningham; rather, he called his mother because he was in trouble and wanted her to know where he was, and he was concerned that there might be some marijuana in the jacket and he did not want her to find it— despite the fact that he had told her the arrest was for possession of cocaine for sale.

Defendant acknowledged that he was making phone calls from jail using personal identification numbers of other inmates, but he said that was because he had lost privileges, not to prevent the authorities from searching for his phone calls.

Defendant denied being involved in the killing after he was arrested in April 2010, and he continued to do so consistently until 2019, lying to family, friends, and the police during that time. Finally, in testimony in 2019, he admitted he was the killer but claimed self-defense for the first time.

In the course of discovery, defendant received a copy of a "witness matrix" created by a detective, with the names of witnesses who had spoken to police about the shooting. Afterward, in 2014, he wrote a letter to a cousin telling her " 'I would be better if these fake friends didn't mention me in this stupid ass case,' " attaching photos of some of the witnesses, accusing one of them of lying and saying that " '[a]nybody that went to Hayward High' " would know her, saying of another that the cousin would know him, and saying of a third that a different cousin would know him. Defendant denied that he wanted his cousin to contact the people on the witness matrix.

An expert testified on defendant's behalf that a toxicology report showed Cunningham had a blood alcohol of .22 percent, which would render him very intoxicated. That level of intoxication could cause lack of coordination, emotional instability, lowered inhibition, impaired judgment, and heightened self-confidence.

### Verdict and Sentence

The jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a)),[2] and found true allegations that he used and personally and intentionally discharged a firearm (§§ 1203.06, subd. (a)(1), 12022.53,

---

[2] All undesignated statutory references are to the Penal Code.

6

subd. (c)).  Defendant moved for a new trial on multiple grounds, including that the court erred in directing the jury to continue deliberating after it indicated it was deadlocked, and the trial court denied the motion.

The trial court imposed a sentence of 15 years to life for the murder (§ 190, subd. (a)), with a consecutive 20 years for a firearm enhancement (§ 12022.53, subd. (c)), for a total term of 35 years to life.  This timely appeal ensued.

## DISCUSSION

### I. Evidence of Cunningham's Prior Behavior

Defendant contends the trial court abused its discretion in excluding evidence of a previous incident in which Cunningham, while intoxicated, was on the receiving end of an assault.

At the outset of trial, defendant sought to introduce this evidence under section 1103 of the Evidence Code, which, as pertinent here, permits evidence of the character of the victim of a crime, including specific instances of conduct, if "[o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character."  (Evid. Code, § 1103, subd. (a)(1).)

Based on its review of a police report, the trial court summarized the incident as follows:  "On May 1, 2009, at approximately 11:41 p.m., [Hayward] officers responded to a report of an argument.  Officers arrived and saw two males, including Mr. Cunningham who was bleeding from the face.  Mr. Cunningham told the officers that 11 minutes earlier he was standing outside of his apartment complex when someone turned around and hit him in the face four to five times for reasons unknown to Mr. Cunningham and took off running.  Mr. Cunningham said that he did not know the person.  The officer noted in the report that Mr. Cunningham was,

7

quote, extremely intoxicated, end quote, and became, quote, agitated, end quote, with Hayward Fire Department personnel who were attempting to treat Mr. Cunningham and Mr. Cunningham declined treatment."

Defendant offered this evidence to show that Cunningham had a propensity to provoke people to attack him while he was intoxicated, because it was unlikely he would repeatedly have been the victim of unprovoked attacks.[3]

The trial court ruled the evidence inadmissible under Evidence Code sections 1103, 350, and 352 and on hearsay grounds, because the evidence relied on Cunningham's statements to officers and because the jury would have to speculate that Cunningham was violent or engaged in some other provocative act.

We review rulings on the admission of evidence for abuse of discretion, reversing only if the appellant shows " 'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 828.)

Defendant has not made such a showing here.   Evidence is admissible only if it is relevant (Evid. Code, § 350), that is, if it " ' " 'tends, "logically, naturally, and by *reasonable inference*" to establish material facts' " ' " (*Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1213, italics added; accord, Evid. Code, § 210.)  Under this rule, evidence that suggests a fact merely by " ' "[s]peculative inference[]" ' " is inadmissible.  (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1337.)

---

[3] Defendant also sought admission of evidence of a second incident in which Cunningham was injured, but he does not claim on appeal that the trial court abused its discretion in not admitting it.

8

Defendant argues that being punched in the face while intoxicated somehow has a tendency in reason to show Cunningham had a proclivity for provocation or violence, but we are unpersuaded. Defendant makes no argument that Cunningham's statements to officers at the time of the May 1, 2009 incident were not hearsay or that they fell within any exception to the hearsay rule. And even if those statements were admissible, their effect is to show that the attack on him was unprovoked, not that he had a tendency to engage in provocative or violent behavior. Without Cunningham's words, the only evidence is the officer's observation that Cunningham was injured, that he was intoxicated, and that he became "agitated" when paramedics tried to treat him. As the trial court noted, those facts do not show that Cunningham's injuries were caused by an attack, let alone that Cunningham had been violent or provoked an attack. Defendant interprets defendant's "agitated" behavior toward paramedics to mean "belligerent conduct"—leading to an inference that Cunningham had been similarly belligerent with whomever caused his injuries—but that interpretation is speculative in the extreme. We conclude the court did not abuse its discretion in finding the evidence inadmissible under section 350.

Defendant suggests the trial court's ruling should not be reviewed for abuse of discretion because it deprived him of the right to present a complete defense, a matter of federal constitutional concern. But it is well established that, as a general matter, application of the ordinary rules of evidence does not violate a defendant's right to present a defense. (*People v. Andrade* (2015) 238 Cal.App.4th 1274, 1290.) Defendant has not shown that the federal Constitution required the trial court to admit hearsay or other evidence of only speculative value.

9

## II. Instruction on Failure to Explain or Deny Evidence

The jury was instructed pursuant to CALCRIM No. 361 as follows: "If the Defendant failed in his testimony to explain or deny evidence against him and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the Defendant guilty beyond a reasonable doubt. [¶] If the Defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

This instruction is based on "the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him or her but fails to do so, then that evidence may be entitled to added weight." (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 605 (*Grandberry*).) Its focus is not on the defendant's credibility when testifying, " 'but on the role of a testifying defendant's failure to explain or deny incriminating evidence in how jurors "evaluat[e] that evidence," i.e., the evidence the defendant has failed to explain or deny.' " (*Ibid*.) This instruction should be given "only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117.)

Our colleagues in Division One have explained that when a defendant challenges this instruction on appeal, our task is " 'to ascertain if [the] defendant . . . failed to explain or deny any fact of evidence that was within the *scope of relevant cross-examination*' and was 'within [the defendant's] knowledge which he did not explain or deny.' " (*Grandberry*, *supra*, 35 Cal.App.5th at p. 606, quoting *People v. Saddler* (1979) 24 Cal.3d 671, 682,

10

italics added.)  In doing so, they rejected a more restrictive approach followed in other cases holding that the instruction may not be given unless the defendant has been *asked a question* calling for either an explanation or a denial.  (*Grandberry*, at pp. 607–608, discussing *People v. Roehler* (1985) 167 Cal.App.3d 353, 392 and *People v. Vega* (2015) 236 Cal.App.4th 484, 498.)  We need not take a position on the proper resolution of this issue, because we would reach the same conclusion under either standard.

Defendant contends the trial court erred in giving CALCRIM No. 361 because he did not fail to explain or deny any evidence during his testimony. Although he did not object to the use of the instruction below, we will examine the merits of his contention as necessary to determine whether any instructional error affected his substantial rights.  (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; § 1259.)

As discussed above, defendant did not answer, or claimed he did not have the knowledge to answer, many questions he was asked on cross-examination.  For instance, defendant testified that he did not recall how close to him Cunningham was when defendant fired the first and second shots, something he might reasonably be expected to know, even if not with absolute precision.  Gonzales testified that she was on the phone with defendant at the time of the encounter and that she heard him threaten to "put a cap in [Cunningham's] ass," and phone records showed several calls between their phones around that time, but defendant testified he did not recall any phone conversation with her.  He also displayed a remarkable inability to recall information about his weapon.  There was evidence that before trial defendant had told West he threw the gun onto a roof after shooting Cunningham and then later disposed of it in a body of water, evidence that might cast doubt on his claim of self-defense because disposing

11

of evidence could show a consciousness of guilt. (See *People v. Jones* (2018) 26 Cal.App.5th 420, 441; Evid. Code, § 413.) On cross-examination at trial, however, he denied throwing the gun onto a roof but, when asked what he did with the gun after the shooting, testified he could not recall. He also professed not to remember how long he had owned the gun before the shooting, how long he kept it after the shooting, or whether he had ever fired it before he fired it at Cunningham. And in response to questions, defendant had no explanation for the notes he wrote about the potential witnesses against him in the letter he sent to his cousin from jail, notes that could reasonably be construed to suggest that he wanted the witnesses to be dissuaded from testifying against him.

All of this evidence was potentially incriminating, and defendant could reasonably have been expected to have knowledge of it. But even in the face of direct questioning, he claimed not to have such knowledge. The trial court did not abuse its discretion in instructing the jury it could consider defendant's professed lack of recollection in evaluating the evidence.

## III. Prosecutorial Misconduct

Defendant contends the prosecutor committed misconduct in two respects.

First, the prosecutor told the jury: "Now, in terms of reasonable doubt, that is the standard in this case. The instructions will have it for you. The way I describe it to individuals is, number one, ask yourself if you have a doubt. Ask yourself if you have a doubt if it happened the way Chelsie described that it happened. If it happened the way Yvonne [Gonzales] heard it. Because the only doubt that could have been brought up in this case was from the Defendant. Did he create doubt for you. Do you believe what he had to say about the version of events. Because here's the thing, I did it this

12

morning, I'll do it again, his details don't make sense." This argument, defendant contends, improperly shifted the burden of proof from the People to defendant.

We first note that this argument appears to have been forfeited by failure to raise it below. A defendant may not complain on appeal of prosecutorial misconduct unless the defendant raised the issue in the trial court and asked that the jury be admonished to disregard it. (*People v. Stanley* (2006) 39 Cal.4th 913, 952 (*Stanley*).)[4]

In any event, on the merits we see no reversible error. A defendant who attacks a prosecutor's argument for improperly shifting the burden of proof "must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*); accord, *People v. Marshall* (1996) 13 Cal.4th 799, 831–832 (*Marshall*).)

We see no reasonable likelihood the jury understood the prosecutor's comments to mean defendant had the burden to establish his innocence. The trial court properly instructed the jury on the burden of proof. At the outset of his argument, the prosecutor explained that it was his burden to prove every element of the crime beyond a reasonable doubt. Before asking the jury whether defendant "create[d] doubt for you," the prosecutor pointed to the

---

[4] When the prosecutor commented on defendant's failure to remain at the scene after killing Cunningham, defendant complained that the argument was improper under *Griffin v. California* (1965) 380 U.S. 609, which forbids remarking on an accused's silence at trial. But he did not complain about the more general comments quoted above, which were made after the prosecutor had moved on from his argument on defendant's flight from the scene.

testimony of Chelsea and Gonzales, and after the comment the prosecutor argued that defendant's story did not "add up" because if Cunningham were as close to defendant as he testified, defendant would not have had time to decide to shoot him. In context, these comments are most naturally seen as an argument that the prosecutor had proved defendant's guilt and that defendant's testimony did not call that case into question, not as a suggestion that defendant bore the burden of proof. (See *Marshall*, *supra*, 13 Cal.4th at p. 832 [prosecutor could legitimately argue that in order to cast doubt on prosecution's case, defendant asserting third party culpability must identify possible perpetrator].) Defendant has not shown prosecutorial misconduct on this ground.

As his second assignment of prosecutorial misconduct, defendant points to a comment the prosecutor made at the outset of his closing argument. After describing the killing as a senseless act of violence and asserting it was not done in self-defense, the prosecutor said: "This was a cold-blooded killing. A brutal murder that for the past 14 years, Chelsie had been coping with. In those same 14 years, the Defendant has done anything and everything to get away with that very same murder. That ends here and now. It ends with the 12 of you and it ends with a verdict of guilty on murder. Because nothing will bring back Chelsie's dad, but a verdict of guilty on murder will finally hold the man accountable that took him from her." This argument, defendant contends, was improper both because it encouraged the jury to view the crime through the eyes of the victim and because it falsely placed the blame for the delay in prosecution on defendant.

Once again, defendant forfeited this argument by failing to raise it below. (See *Stanley*, *supra*, 39 Cal.4th at p. 952.) He made no contemporaneous objection to these remarks about the delay in trial and any

14

effect on Chelsie.  After defendant's closing argument, his counsel informed the court that "Mr. Turner also wants me to object to the perceived vouching in [the prosecutor's] closing for the veracity of the witness."  The trial court overruled the objection, concluding the prosecutor did not try to throw the weight of his office behind the credibility of any witness.

Defendant argues that this belated objection was sufficient to preserve the argument he now makes on appeal.  We are unpersuaded.  A challenge to prosecutorial misconduct must be not only timely but on the same ground as raised on appeal.  (*People v. Pearson* (2013) 56 Cal.4th 393, 426; *Stanley*, *supra*, 39 Cal.4th at p. 952.)  The challenged comments in no manner involved vouching, and indeed, on appeal defendant makes a different argument—that the prosecutor inappropriately blamed defendant for the delay and asked the jury to view the case through Chelsie's eyes.

Even if the argument were preserved, we would reject it.  Defendant argues that most of the 14-year delay was the result of the reversal of his original conviction.  Not so.  The first trial took place in 2019, almost eight years after the killing.  And there was ample evidence that during that time defendant sought to escape responsibility for the crime by, for instance, fleeing the scene and hiding, disposing of the weapon, asking his uncle to get rid of his jacket, trying to get his cousin to dissuade witnesses, and lying for years about his involvement in the killing.  There is no reason to think the jury misunderstood the argument as a comment on the reason for the delays caused by the reversal of his conviction.  As to the prosecutor's passing comment that Chelsie had been "coping with" the murder, even if it was an appeal for sympathy, we see no possibility that the jury—which had seen Chelsie testify about witnessing her father's killing—applied this brief

15

mention in an improper manner. (*Centeno*, *supra*, 60 Cal.4th at pp. 666–667.)

We thus see no grounds to reverse for prosecutorial misconduct.

## IV. Juror Coercion and Rejection of Impasse

Defendant contends the trial court erred by directing the jury to continue deliberations after it indicated it had reached an impasse and that the court coerced a verdict by focusing its attention on a single holdout juror.

### *Relevant Proceedings*

The jury began deliberations just after 2:30 p.m. on December 19, 2023 and retired for the evening about an hour and a half later, before resuming deliberations on December 20.

On the morning of the following day, December 21, Juror 10 sent a note to the trial court asking to "be removed from [the] jury. The pressure of coming up with a verdict is putting a lot of stress and burden on me." The trial court spoke with Juror 10 and asked her what she meant by her note. She replied that as the jury deliberated the previous day, "when I was trying to speak, everybody was like shutting me down. When I try to voice my opinion, they were trying to tell me that I'm wrong." She said she felt like she "was ganged up on. These people [were] ganging up on me because I feel the way I feel and they feel different." The court asked why she felt stressed as a result, and she answered, "I couldn't sleep last night. I thought about this all night. And then when we get there this morning, we're up there and everybody is looking at me telling me, well, you need to keep expressing why you feel this way."

Outside the presence of Juror 10, the court told counsel the jury might be at an impasse, and suggested providing the instruction for a deadlocked jury. The prosecutor said that after just six or seven hours of deliberation,

16

such an instruction might not be necessary, and defense counsel suggested an instruction telling the jury to listen and have an open mind, although he expressed concern about "giv[ing] a cue to anybody." The court told Juror 10 that it was going to speak to the entire jury without singling her out, and told her to send another note if she continued to have concerns.

The court then spoke to the entire jury and instructed them "Each of you must decide the case for yourself but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong, but do not change your mind just because other jurors disagree with you. Keep an open mind and openly exchange your thoughts and ideas about this case. Please treat one another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other."

At 3:10 p.m. on the same day, the jury sent the trial court a note stating, "Wish to inform the Court that we are unable to agree to guilt on 2nd Degree murder, due to discrepancies in our understanding of malice aforethought, specifically in its formation before the act." With the agreement of both counsel, the trial court instructed the jury pursuant to CALCRIM No. 3551: "Sometimes jurors that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict. Please consider the following suggestions: Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position

17

just because it differs from that of other jurors or just because you or other jurors want to reach a verdict.  Both the People and the Defendant are entitled to the individual judgment of each juror.  [¶] It is up to you to decide how to conduct your deliberations.  You may want to consider new approaches in order to get a fresh perspective.  Let me know whether I can do anything to help you further, such as reread any instruction[] that is the subject of a disagreement, give additional instructions or clarify instructions I have already given you, have testimony read back to you or give the attorneys an opportunity to give limited further argument on any issue.  [¶] Please continue your deliberations at this time."  The court also informed the jury that if further deliberations were needed, they would resume on Wednesday, December 27.

At 4:11 on the same day—December 21—the jury sent another note asking two questions:  First, "Can you please explain, in layman's terms, Malice Aforethought, and provide specific examples."  Second, "Did the parties stipulate that (1) the defendant committed an act that caused the death of Mr. Cunningham[;] (2) When Turner acted, he had the state of mind of implied malice?"

The court sent the jury a written response on December 27, after the holiday weekend, telling it there had been no stipulation as to either of those matters.  Later that morning, the jury requested and—with counsel's agreement—received a readback of the portion of defendant's testimony in which the prosecutor asked him specific questions connected to malice aforethought.

At approximately 1:00 p.m. on December 27, 2023, the jury sent a note to the court saying that it could not agree on whether defendant was guilty of second degree murder, and that "at least one juror refuses to participate in an

18

exchange of views, will not offer a rationale or evidence/argument to support a not guilty verdict, and intends to create a hung jury/mistrial, having stated that as their intent multiple times, in possible violation of our oath." (Capitalization omitted.)

In response to this note, the trial court questioned the jurors individually, out of each other's presence. The foreperson, Juror 8, told the court the note referred to Juror 10, and said that Juror 10 had expressed a view or conclusion by the morning of the second day of deliberations. The foreperson said Juror 10 often did not respond directly to questions and could be "[b]elligerent" when pressed. When Juror 10 expressed her views, according to the foreperson, her reasoning was difficult to follow. The foreperson was unsure Juror 10 was "open to the deliberative process" as the court had defined it. Questioned individually, the other jurors indicated variously that Juror 10 was the focus of concern, that she expressed her views on the correct verdict early in the deliberations, that she did not explain those views to the others' satisfaction, and that she was sometimes unresponsive to questions and deliberations, reading the instruction booklet while discussions were taking place.

Juror 10 was questioned last. She told the court she had explained her views of the evidence and had participated in votes. She thought the other jurors "shut [her] off" when she spoke and talked over her when she tried to explain her views. Her views differed from those of all the other jurors.

Outside the presence of the jury, the court and counsel then discussed whether Juror 10 should be discharged. The prosecutor expressed skepticism that Juror 10 was participating in deliberations, and defense counsel disagreed, arguing that it appeared Juror 10 was trying to participate, although "illogically." He suggested that "comprehension" might be a

19

problem for Juror 10, and that she was "fairly timid" and "perhaps a little bit more easily intimidated than other people," but he argued that the jurors' comments showed she was participating in deliberations, though not in an "articulate" manner.  He argued Juror 10 should not be discharged.

The trial court ruled against discharging Juror 10.  Shortly afterward, the jury retired for the evening.  The jury resumed deliberations the following morning, December 28, and at about 2:30 that afternoon it informed the court it had reached a verdict.

### Analysis

Defendant contends the trial court coerced the jury and deprived him of his right to a jury when it rejected the jury's declaration of an impasse, questioned each juror individually, and directed them to resume deliberations.

Section 1140 provides that a jury may not be discharged without reaching a verdict unless both parties consent or unless "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."  The determination of whether there is a reasonable probability of agreement " 'rests in the discretion of the trial court,' " and "a court 'is not bound to take as final the statement of the [jurors] that they cannot agree upon a verdict.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 159 (*Valdez*).)  However, the court must exercise its power without coercing the jury, " 'so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." ' " (*People v. Sheldon* (1989) 48 Cal.3d 935, 959 (*Sheldon*); see *People v. Young* (2007) 156 Cal.App.4th 1165, 1171.)  When a trial court receives a report of juror misconduct or an impasse it may make inquiries of the jury and provide further instructions, "but such interventions must be

20

limited and undertaken with the utmost respect for the sanctity of the deliberative process." (*People v. Nelson* (2016) 1 Cal.5th 513, 569 (*Nelson*).)

Defendant contends the trial court crossed the line of permissible inquiry by questioning the jurors individually, with a focus on the single holdout juror, and by instructing the jurors to keep an open mind after an impasse had been declared and to deliberate with the goal of reaching a verdict.

The first problem with this contention is that defendant appears to have waived it, not only by failing to raise it below, but also by arguing to the trial court that Juror 10 was participating in the proceedings and urging, successfully, that she be retained on the jury. By failing to object below, a defendant can forfeit a claim of error in directing a jury to resume deliberations after an impasse is declared. (See *People v. Neufer* (1994) 30 Cal.App.4th 244, 253–254, citing *People v. Saunders* (1993) 5 Cal.4th 580, 589–591.) And, under the doctrine of invited error, which is " 'designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest[,] [i]f defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [defendant invited error by affirmatively joining challenge to juror].)

These principles foreclose defendant's contention here. He encouraged the trial court to retain Juror 10 on the jury, a request that implies that he sought to have the jury continue its deliberations. And a tactical purpose is

clearly implied:  the jury's responses strongly suggested that Juror 10 was holding out against a verdict of second degree murder, and counsel may have been of the opinion that the best outcome would be for the jury to continue its deliberations in the hope that she could persuade other jurors to her point of view or, at the least, hold firm until the court determined the jury was unable to reach a verdict.

In any event, we see no abuse of discretion, and no deprivation of defendant's right to a jury, in the trial court's direction that the jury continue its deliberations.  It is true that a court may coerce holdout jurors by singling them out with a request to reconsider their position (see *Valdez, supra,* 55 Cal.4th at pp. 161–162) or by making remarks that might suggest the court's own view on the merits of the case or about the need to reach a unanimous verdict (*Sheldon, supra,* 48 Cal.3d at pp. 959–960; *People v. Carter* (1968) 68 Cal.2d 810, 816–817).  Here, on the other hand, although the trial court was aware that a verdict was being held up by a single holdout juror, it carefully told each juror during individual questioning not to disclose the results of the voting.  And after the first jury note suggesting an impasse, the court instructed the jury that *sometimes* jurors who had difficulty reaching a verdict were able to do so after resuming deliberations; that "[e]ach of you must decide the case for yourself and form your individual opinion" after considering all evidence, that their duty was "to deliberate with the goal of reaching a verdict *if you can do so without surrendering your individual judgment,*" and that they should not change their position just because it differed from that of other jurors or because they wanted to reach a verdict.

Nothing in the trial court's comments suggested it favored any particular outcome or that the jurors should set aside their individual judgment for the sake of reaching a verdict.  (See *Sheldon, supra,* 48 Cal.3d

at pp. 958–960 [no coercion in instructing jury divided 11–1 to return to deliberations with direction to consider evidence with purpose of arriving at verdict if possible, that jurors decide case for themselves, and that they should not make decision because of views of majority of jurors]; *People v. Bell* (2007) 40 Cal.4th 582, 617–618 [instruction ordering further deliberations so jurors could " 'understand fully each other's viewpoint' " was "not of a character that would expressly or impliedly coerce a verdict"], overruled on another point by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.)

We recognize, as our high court has, that there is "a *potential* for coercion once the trial judge has learned that a unanimous judgment of conviction is being hampered by a single holdout juror." (*Sheldon*, at p. 959.) But the trial court here made no comments that suggested a preference either for a particular outcome or for Juror 10 to surrender her individual judgment. Its detailed inquiries were made after a report of potential misconduct by Juror 10, and the court repeatedly emphasized the sanctity and privacy of the jury's deliberations. (Compare, *Nelson, supra*, 1 Cal.5th at p. 569 [trial court acted improperly when, based on reported impasse without allegation of jury misconduct, trial court asked jurors about thoughts and conduct of fellow jurors].) We thus reject defendant's contention that the trial court coerced Juror 10 to vote to convict him.

V.    **Imposition of 20-Year Enhancement**

In sentencing defendant, the trial court imposed a term of 15 years to life for murder and a consecutive 20-year term for a firearm enhancement. (§ 12022.53, subd. (c).) Defendant contends that under amendments to section 1385 (Stats. 2021, ch. 721, § 1), the trial court was required to strike the enhancement.

23

Section 1385, subdivision (c)(1), provides that a sentencing court "shall dismiss an enhancement if it is *in the furtherance of justice to do so*," unless prohibited by an initiative statute. (Italics added.) In "exercising its discretion" on this point, the court "shall consider and afford great weight" to certain enumerated mitigating circumstances, proof of which "*weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety*." (§ 1385, subd. (c)(2), italics added.) There are nine such circumstances, among them that "[t]he application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2)(C).) It is the "shall be dismissed" language that is at issue: only two of the nine enumerated circumstances include it. (§ 1385, subd. (c)(2).)

In his sentencing memorandum, defendant asked the trial court to dismiss the enhancement under this provision. In declining this request and imposing a 20-year enhancement for personal and intentional discharge of a firearm (§ 12022.53, subd. (c)), the court explained that it had taken into account the sentencing factors set forth in the California Rules of Court. (Cal. Rules of Court, rules 4.410 [sentencing objectives], 4.421 [circumstances in aggravation], 4.423 [circumstances in mitigation], & 4.428, subdivision (b) [imposition of enhancements].) The court concluded that imposing the enhancement "results in the most accurate reflection of Mr. Turner's conduct. He unnecessarily and intentionally used and discharged a firearm, twice shooting and killing Mr. Cunningham in front of his 13-year-old daughter while she was trying to calm the situation," causing her "unimaginable trauma."

As defendant points out, the trial court did not find that dismissal of the enhancement would endanger public safety. He argues that, as a result,

24

the court was bound by the provision that if application of an enhancement would result in a sentence of more than 20 years, the enhancement "shall be dismissed." (§ 1385, subd. (c)(2)(C).)

Defendant points our attention to no authorities supporting this interpretation, and the only cases to address the question have squarely rejected it. The court in *People v. Mazur* (2023) 97 Cal.App.5th 438, 443 considered and rejected a contention that the trial court was required to dismiss an enhancement that resulted in a sentence of more than 20 years, where the trial court did not find that dismissal would endanger public safety. The appellate court explained that the " 'shall be dismissed' " language of section 1385, subdivision (c)(2)(C), as well as a similar provision relating to multiple enhancements, subdivision (c)(2)(B), "cannot be read in isolation. [Citations.] Construed as a whole, the statute makes clear that all the mitigating circumstances listed in subdivision (c)(2) merely guide the court's discretion in determining whether a dismissal is in furtherance of justice." (*Mazur*, at p. 445.) That is, subdivision (c)(1) establishes the " 'furtherance of justice' standard for dismissal," and subdivision (c)(2) requires the court to "give great weight to the presence of any one or more of the nine listed mitigated circumstances '[i]n exercising its discretion' whether to dismiss." (*Mazur*, at p. 445.) Read in the context of the statute as a whole, the *Mazur* court concluded, the " 'shall be dismissed' " language of subdivision (c)(2)(C) requires dismissal of an enhancement only if the court finds it " 'in the furtherance of justice.' " (*Mazur*, at p. 445, citing § 1385, subd. (c)(1).)

The court in *People v. Anderson* (2023) 88 Cal.App.5th 233 reached the same conclusion. It explained that, read in isolation, the "shall be dismissed" language of section 1385, subdivision (c)(2)(B) and (C) was "mandatory, not permissive," but that the provision must be read in the context of the statute

25

as a whole.  (*Anderson*, at p. 239.)  In that context, "the statement that a court 'shall' dismiss certain enhancements appears as a subpart to the general provision that a 'court shall dismiss an enhancement *if* it is in the furtherance of justice to do so.' "  (*Ibid*.)  The statutory language taken as a whole establishes that "[t]he dismissal *shall* occur but only *if*, in exercising its discretion and giving great weight to certain factors, the court finds dismissal is in the interests of justice or would not endanger public safety."  (*Id*. at p. 240.)

In a closely related context, our high court in *People v. Walker* (2024) 16 Cal.5th 1024, 1028–1029 (*Walker*), rejected a position that section 1385's requirement that a court " 'afford great weight' " to mitigating circumstances creates a "rebuttable presumption that obligates a court to dismiss the enhancement *unless* the court finds that dismissal of that enhancement . . . would endanger public safety."  Rather, the correct rule is that unless a court finds that dismissal would endanger public safety, the court has *discretion* to impose or dismiss enhancements as long as it "assigns significant value" to the mitigating circumstances.  (*Walker*, at p. 1029.)  Viewing section 1385 as a whole, " 'the ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement.' "  (*Walker*, at p. 1033, quoting *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1098.)  In exercising its discretion on this question, even in the presence of a mitigating circumstance, a sentencing court may impose an enhancement based on "circumstances 'long deemed essential to the "furtherance of justice" inquiry,' " including the circumstances in aggravation and mitigation found in California Rules of Court, rules 4.421 and 4.423.  (*Walker*, at p. 1033, citing Advisory Committee comment to rule 4.428.)

Defendant points out that the *Walker* court noted that it had no occasion to consider the precise question he raises—that the "shall be dismissed" language of section 1385, subdivision (c)(2)(B) and (C), unlike that of other enumerated mitigating factors, divests a trial court of discretion to impose an enhancement absent a public safety finding. (*Walker*, *supra*, 16 Cal.5th at p. 1035, fn. 5.) Nevertheless, we find *Mazur* and *Anderson* persuasive, dispositive, and consistent with the reasoning of *Walker*. Without a finding that dismissal would endanger public safety, subdivision (c)(2)(C) of section 1385 *allows* and even encourages the trial court to exercise its discretion to strike an enhancement, but it does not *require* it to do so. In imposing the enhancement, the trial court expressly referred to the standards of rules 4.421, 4.423, and 4.428 of the California Rule of Court, standards that our high court has explained are properly part an inquiry into the " 'furtherance of justice.' " (*Walker*, *supra*, 16 Cal.5th at p. 1033.) Defendant makes no showing that this ruling was an abuse of the trial court's discretion.

We need not address defendant's contention that he suffered cumulative prejudice because we do not find multiple errors, nor his contention that his counsel rendered ineffective assistance by failing to preserve any of his claims because we have addressed the merits of each.

## DISPOSITION

The judgment is affirmed.

TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*People v. Turner* (A171252)

27